UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| MAINE REPUBLICAN PARTY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 18-cv-00179-JDL |
| | ) | |
| MATTHEW DUNLAP, SECRETARY | ) | |
| OF STATE OF THE STATE OF MAINE | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S OBJECTION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION, WITH INCORPORATED MEMORANDUM OF LAW

The Maine Republican Party ("MRP") has filed a last-minute challenge to the Ranked-choice Voting ("RCV") law, seeking to block its implementation in the Republican primary on June 12, 2018, based on its speculation that a candidate who might win the Republican primary by the RCV method, as opposed to by a plurality of the votes, will not be the type of "standard bearer" that the party wants. The underlying factual assumptions for this theory are highly debatable and empirically unproven. Moreover, MRP cites no case law to support its contention that a method of voting – as distinct from rules governing who can vote in the primary or what requirements party candidates must meet to qualify for the ballot – could somehow harm the MRP's First Amendment rights of association. The candidates whose names will appear on the Republican primary ballot have already met the threshold requirements to become the party's nominees (or "standard bearers") for state office.

States are constitutionally permitted to require parties to select their nominees by primary election, and the RCV law, enacted by a majority of Maine voters, establishes a neutral method

of counting ballots at the upcoming primary election.  The nondiscriminatory, uniform application of the RCV law does not violate the MRP's First Amendment rights of association.

MRP's motion for preliminary injunction should be denied.  As both the Maine Superior Court and the Maine Law Court have already ruled in two previous lawsuits, RCV is the law that must govern the counting of ballots at the June 12, 2018 primary election.  *See Maine Senate v. Sec'y of State*, 2018 ME 52, ¶ 24, __ A.3d __ (per curiam); and *Comm. for Ranked-choice Voting et al. v. Sec'y of State*, Docket No. AUGSC-CV-18-24 (Me. Super. Ct., Ken. Cty.  Apr. 3, 2018) (discussed below).

## STATUTORY FRAMEWORK

Primary elections.  Maine law requires parties to nominate candidates for state and federal offices by primary election, 21-A M.R.S.A. § 331(1), and has done so for more than 100 years since adopting the "direct primary law" by citizen-initiative in 1911.  P.L. 1913, c. 221. *See* Lewis Burleigh, *Our New Election Laws*, 5 Me. Law Rev. 264 (June 1912); Oren Chalmer Hormell, *The Direct Primary with Special Reference to the State of Maine* (Bowdoin Coll. 1922).  Similar laws were adopted in a number of states as part of a wave of Progressive Era reforms designed to remove control of the nomination process from "party bosses" and "smoke-filled rooms" and place it in the hands of the party's rank-and-file voters.  *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 206 (2008); *Alaskan Independence Party v. Alaska*, 545 F.3d 1173, 1177 (9th Cir. 2008).

Originally adopted as a "closed primary," meaning that only voters enrolled in the party were eligible to vote at a primary election, P.L. 1913, c. 221 § 11, the statute was amended in 1987 in response to the Supreme Court's ruling in *Tashjian v. Republican Party of Connecticut*, 470 U.S. 208 (1986), to offer parties the option of allowing unenrolled voters to participate in

2

their primary.  *See* P.L. 1987, c. 423 (eff. Sept. 29, 1987), enacting 21-A M.R.S.A. § 340, and

L.D. 1468, Statement of Fact (113th Legis. 1987).  Each party must notify the Secretary of State

by February 1st of the election year if it wishes to adopt such eligibility requirements; if no notice

is received by that date, then only voters enrolled in the party are eligible to vote in the primary

that year.  21-A M.R.S.A. § 340(1).

To qualify as a candidate for the party's nomination on the primary election ballot, a

candidate must collect a certain minimum number of signatures of registered voters who are

enrolled in the same party and reside in the electoral district.  *Id.* §§ 334-336.  The candidate who

wins the primary automatically gains access to the general election ballot as the party's sole

nominee for that particular elective office.  *Id.* §§ 301, 331.

Parties must meet and maintain certain qualifications to participate in the primary

election.  These include the requirement to maintain a minimum number of enrolled voters; to

conduct a state convention; and to hold municipal caucuses in at least fourteen counties of the

state.  *Id.* §§ 301, 321.

The primary election is considered to be a separate election for each party under Maine

law, *id.* § 339, but it is administered by the State with the assistance of local election officials (all

at taxpayer expense), according to a uniform set of procedures set forth in Title 21-A, chapter 9,

"Conduct of Elections."[1]  The Secretary of State must design, print, and distribute the primary

election ballots to all the municipalities, *id.* §§ 601, 606, 651, and provide instructions to voters

as well as municipal officials, § 605-A.  The hours for opening and closing the polls, and

procedures for issuing and processing absentee ballots, arranging the voting place and voting

booths, checking in voters, marking ballots, counting ballots, securing election materials, and

---

[1]  This has been true from its inception in 1911.  P.L. 2013, c. 221, § 29; discussed in Burleigh, *Our New Election Laws*, 5 Me. Law Rev. at 267-270.

reporting results are all spelled out in statute and do not vary by party. *Id.* §§ 626-629, 671, 681, 691-693, 695-696, 698-700, 711-712.[2] The objective of these statutes is to achieve uniformity and consistency, and to assure the integrity and reliability of the election process. *See* Declaration of Secretary of State Matthew Dunlap (ECF 13) at ¶¶ 13 & 15.

Ranked-choice voting. At a statewide election on November 8, 2016, Maine voters adopted ranked-choice voting as the method of voting and determining elections for all state and federal offices (except for President and Vice President) and in all party primaries to select the nominees for those offices. I.B. 2015, c. 3, "An Act to Establish Ranked-choice Voting" ("the Act"). The Act defines "ranked-choice voting" as "the method of casting and tabulating votes in which the voters rank candidates in order of preference, tabulation proceeds in sequential rounds in which the last-place candidates are defeated and the candidate with the most votes in the final round is elected." *Id.* § 2, enacting 21-A M.R.S. § 1(35-A).

The procedure for ranked-choice voting begins with tallying voters' first choices. If one candidate receives over 50% (i.e., a majority) of the voters' first-choice rankings, that candidate wins because it is "mathematically impossible" for any other candidate to surpass that candidate's vote total in a subsequent round. 21-A M.R.S.A. § 723-A(1)(G). If no candidate wins a majority of voters' first-choice rankings, then the process continues. The candidate who received the lowest number of first-choice rankings is defeated, and the second choices of those voters who preferred that defeated candidate are then added to the first-choice rankings of those "continuing candidates" in round two. *Id.* § 723-A(1)(C) & (E). The rounds of counting

---

[2] The only distinction referenced is that "[t]he paper for each party's primary ballot must be printed or distinguished with a different color marking as determined by the Secretary of State" – presumably to help ensure that local officials hand the correct ballot to a voter when the voter arrives and is checked off the incoming voter list. 21-A M.R.S.A. § 601(4).

continue in this manner until there are only two "continuing" candidates left.  In that final round of counting, the candidate who receives the most votes wins.  *Id.* § 723-A(2)(A).

FACTUAL BACKGROUND

History of RCV law.  The citizen-initiated RCV law took effect on January 7, 2017, 30 days after the Governor proclaimed the results of that election, pursuant to Me. Const. art. IV, pt. 3, § 19.  The law specified that the RCV method would apply to elections held on or after January 1, 2018.  I.B. 2015, c. 3, § 6.

On February 2, 2017, the Maine Senate adopted an order, proposed by leadership, requesting an opinion of the Justices of the Maine Supreme Judicial Court regarding the constitutionality of RCV as applied to general elections for the offices of Governor, State Senator, and State Representative.  Senate Order 12, Legis. Rec. S-111 (Daily ed.) (128th Legis. 2017), quoted in *Opinion of the Justices*, 2017 ME 100, 162 A.3d 188.  The Republican Caucus of the Maine House, represented by the same counsel who is representing MRP in this lawsuit, the Maine Senate (controlled by Republicans), the Secretary of State, and the Attorney General all submitted briefs to the Justices.  All of them concluded that the RCV method of determining the winner in a general election conflicts with provisions of the Maine Constitution, which specify that the winners of elections for Governor, State Senator, and State Representative must be determined by a plurality of the votes.  *See* Me. Const. art. IV, pt. 1, § 5, pt. 2, §§ 3 & 4, and art. V, pt. 1, § 3.  These constitutional provisions have no bearing on primary elections, "which are governed entirely by statute and find no source in the Maine Constitution itself." *Maine Senate v. Sec'y of State*, 2018 ME 52, ¶ 5 n. 5; *see also In re Primary Election Ballot Disputes 2004*, 2004 ME 99, ¶ 3, 857 A.2d 494.

In its opinion request, the Maine Senate explained the urgency of addressing the constitutionality of RCV, noting that if the Act were applied to elections in 2018 without resolving these issues, a candidate for Representative, Senate, or Governor who gained a plurality of the votes counted at the municipal level but then failed to prevail in subsequent rounds of RCV counting could challenge that result, thereby "plac[ing] the validity of the election into question and delay[ing] the seating of a Representative, Senator or Governor."

On May 23, 2017, the Justices issued an advisory opinion, agreeing that the Senate had presented a matter of "live gravity and unusual exigency" and noting that "[t]he time to plan and organize a fair and impartial election is at hand and the doubt surrounding the constitutionality of the Ranked-Choice Voting Act casts uncertainty on all aspects of voting preparation." *Opinion of the Justices*, 2017 ME 100, ¶ 40. The Justices advised that the RCV method of counting ballots conflicts with the plurality vote requirements of the Maine Constitution – for general elections only, however, and only for the offices of Governor, State Senator, and State Representative. *Id.* ¶¶ 64-68. No other constitutional issues were presented to, or addressed by, the Justices.

On May 31, 2017, bills were introduced in the Maine Senate to (a) amend the Maine Constitution and (b) repeal RCV. Neither one was approved. *See* L.D. 1624 (128th Legis. 2017); L.D. 1625 (128th Legis. 2017). On August 2, 2017, the final day of the 128th Legislature's First Regular Session, a bill was introduced to amend the Act to "bring it into constitutional compliance" by applying RCV only to primary elections and to general elections for federal offices, until such time as the Constitution is amended to authorize it for the state offices. *See* L.D. 1646 (128th Legis. 2017). Because the Legislature adjourned *sine die* on August 2, 2017, the bill was held over until a special session in October 2017. The Legislature ultimately enacted

6

an amended version of the bill, which became law without the Governor's signature on November 4, 2017.  P.L. 2017, c. 316, §§ 1-14 (eff. Feb. 5, 2018).

Chapter 316, entitled "An Act to Implement Ranked-choice Voting in 2021," delayed implementation of RCV until elections held after December 1, 2021, and provided that RCV would then be repealed unless an amendment to the Maine Constitution was adopted before that date to authorize RCV in elections for Governor, State Senator, and State Representative.[3]  *See id.* §§ 1-3, 6, 11-14.  A group of citizens began circulating a people's veto petition to reject these provisions of the law immediately after Chapter 316 was enacted.  On February 2, 2018, they submitted the petition to the Secretary of State's Office, and at the end of the review period on March 5, 2018, the Secretary determined that the petition contained enough valid signatures to suspend the designated provisions of Chapter 316, pursuant to Me. Const. art. IV, pt. 3, § 17(2), thereby making RCV applicable to the June 12, 2018 primary election.

On March 5, 2018, the Secretary announced plans to implement RCV for the June 12, 2018 primary.  *See* http://www.maine.gov/sos/news/2018/rankchoicesigs.html.  The Secretary subsequently raised concerns regarding an apparent conflict between the RCV provisions in 21-A M.R.S.A. §§ 1(27-C) and 723-A and the plurality language in the statutes governing primary elections, *id.* § 723(1).  The Committee for Ranked-choice Voting filed a complaint in Maine Superior Court and a motion for temporary restraining order seeking to require the Secretary to implement RCV for the June 2018 primary and arguing that the conflicting plurality provision of section 723(1) was implicitly repealed by the more recently enacted RCV law.  The Superior Court agreed and issued the TRO on April 3, 2018.  *Comm. for Ranked-choice Voting et al. v.*

---

[3]  Chapter 316 also authorized the Secretary of State to promulgate rules implementing RCV, and made some other technical changes to the RCV law, which are not affected by the people's veto.  P.L. 2017, c. 316, §§ 4, 5, and 7-10.

*Sec'y of State*, Docket No. AUGSC-CV-18-24 (Me. Super. Ct., Ken. Cty.  Apr. 3, 2018)

(Murphy, J.).

On April 2, 2018, the Maine Senate adopted an Order authorizing the President of the

Senate to hire legal counsel to:

> intervene in any current litigation involving ranked-choice voting or to bring such separate action as is appropriate to raise statutory and constitutional questions concerning the administration of the ranked-choice election process, including both the primary and general elections, in order to preserve the integrity of the separation of powers provided for in the Constitution of Maine and to preserve the integrity of the election process of Maine and to raise all appropriate claims and to seek all appropriate manner of relief, including but not limited to injunctive relief against any state or municipal official or officials seeking to exercise power relegated to the legislative power of Maine not duly and properly extended to such official or officials.  Any intervention or commencement of a separate action as described in this paragraph must be filed within 21 days of passage of this order.

Senate Order 28 as amended (emphasis added).[4]  The next day, the Maine Senate filed a lawsuit

seeking to enjoin the Secretary of State from implementing RCV in the June primary election.

*Senate of Maine v. Matthew Dunlap*, *Secretary of State,* Docket No. AUGSC-CV-18-51.  On

April 11, 2018, the Superior Court reported the case to the Law Court, with seven questions of

law and a set of stipulated facts agreed to by the parties, which described in considerable detail

how the Secretary was implementing RCV for the June primary.  On April 17, 2018, the Law

Court issued a decision concluding that the plurality provision of section 723(1) was implicitly

repealed by the RCV law and that "ranked-choice voting must be applied to the primary

elections on June 12, 2018."  *Maine Senate v. Sec'y of State*, 2018 ME 52, ¶ 24.

RCV Implementation.  On March 28, 2018, the Secretary proposed rules to implement

RCV, and invited comments on or before April 6, 2018.  ECF 13, ¶ 8.  The process of producing

ballots for the June primary election began in mid-April 2018, and printed ballots have since

---

[4]  The Legislative Record is not yet printed for April, but information is available on the Legislature's bill status website at:  http://legislature.maine.gov/LawMakerWeb/rollcalls.asp?ID=280068500.

been distributed to all 500 voting jurisdictions (cities, towns, and plantations) to comply with 21-A M.R.S.A. § 752, which requires absentee ballots to be available to voters 30 days ahead of the primary election.  ECF 13, ¶ 5.  Instructions to voters explaining how to mark the ballot using the RCV method are printed on the ballot.  *Id.* ¶ 6; Ex. A-1 to A-4 (ECF 13-1 through 13-4).  Ballots were made available to military and overseas voters with the same instructions beginning on April 27, 2018.  ECF 13, ¶ 4.  The only two election contests in the Republican Party primary election that will be determined in accordance with the RCV method are for the office of Governor, and for Representative to the Maine Legislature in House District 75, which includes the towns of Leeds, Turner, and parts of Livermore.  ECF 13, ¶ 7, ECF 13-1 & 13-2.

The Secretary of State's Office conducted training sessions for over 275 local election officials in early May 2018, and has distributed written instructional materials for the upcoming primary, including RCV, to officials in all 500 voting jurisdictions.  ECF 13, ¶ 16.  The final rule implementing RCV was adopted and announced on May 11, 2018, and took effect on that date. ECF 13, ¶ 8 and Exhibit B (ECF 13-5).

The Maine Republican Party opened its state convention on May 4, 2018, and apparently voted that day to adopt a rule declaring that its nominees for U.S. Senator, U.S. Representative, Governor, State Senator, and State Representative "shall be chosen by a plurality of votes cast," rather than by RCV as required by Maine law.  *See* Kouzounas Declaration (ECF 11) at 2 and 11-1 at 9 (Section 16.0).  Previous rules of the party did not specify any method of determining the outcome of elections to choose its nominees, presumably because that was established by state law.  MRP does not explain why it waited so long to hold its convention, which could have been held in March 2018.  21-A M.R.S.A. § 321.

The Rules of the Maine Republican Party still require that the party's officers be elected by a method that is, for all intents and purposes, the ranked-choice voting method. Section 2.3(c) of the Rules, entitled "Procedure for Elections" of party officers provides:

> In each officer election if, on the first ballot, no one candidate receives a majority of the votes cast, the candidate receiving the least number of votes shall be eliminated and a second round of voting will be held. Balloting shall continue in this manner until one candidate receives a majority.

ECF 11-1 at 3. The only difference between this procedure and RCV is that this involves multiple rounds of casting and counting ballots, whereas under RCV the voter marks all of his or her choices on one ballot for multiple rounds of counting. The objective is the same, however, as expressed in the final clause of the MRP's rule: to ensure that in the final round "one candidate receives a majority." Apparently, the MRP believes this method is a good way to choose the leaders of its State Committee, but not its nominees for public office.

The MRP filed this lawsuit, including the Motion for Preliminary Injunction, on May 4, 2018, immediately after adopting Rule 16.0 – but fully *two months after* the Secretary announced his intent to implement RCV for the June primary consistent with the results of the people's veto referendum, *and a month after* the Superior Court issued an injunction requiring him to implement it in this election. At no time prior to filing this lawsuit did the MRP notify the Secretary of State or his office of the party's intent to challenge the applicability of RCV in the upcoming primary election. ECF 13, ¶ 3.

## SUMMARY OF ARGUMENT

The MRP chooses its own leadership pursuant to a ranked-choice voting method, but has filed this lawsuit after the eleventh hour, causing considerable disruption to the electoral process, alleging that the RCV law somehow violates its First Amendment rights of association by using that same voting method to select the party's nominees for public office. After efforts by the

Maine Senate to stop implementation of RCV on a variety of constitutional theories failed last month, the party and its lawyers apparently decided to generate a new lawsuit by adopting a rule in direct conflict with the RCV law, and then arguing that implementation of the RCV law would impermissibly burden its First Amendment rights of association.  A state law that does not affect who can vote in a primary, or how candidates qualify for the ballot, but merely establishes rules for counting ballots, does not burden the MRP's First Amendment rights of association as a political party.  Moreover, MRP does not have a constitutional right to pick and choose which legal requirements should apply to its party in a State-run election.  The election process is not an a la carte menu.  The MRP has not established a likelihood of success on the merits of its constitutional claim.

The balance of equities also tilts against the MRP in this matter, given the MRP's delay in bringing the action until a month before the primary election – after ballots and instructions to voters and election officials have been printed and distributed, and after voters have started casting absentee ballots.  To provide the remedy that MRP requests – instructing Republican voters that, regardless of how many choices they may have marked on the ballot, only their first choice will count – will surely frustrate and confuse voters and potentially discourage them from participation in future elections.  This remedy runs directly contrary to the State's interests in encouraging voter participation in Maine elections.  Such a late change in the rules governing the election would create confusion for voters, as well as for the local election officials on whom the State relies to administer the election in a fair and consistent manner.  Issuance of a preliminary injunction would be contrary to the public interest.

<u>ARGUMENT</u>

<u>Standard of Review</u>.  A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of

persuasion." *Libertarian Party of Maine, Inc. v. Dunlap*, 2016 WL 3039715 *4 (D. Me. 2016),

quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original).

To grant a motion for preliminary injunction, the court must find that the following four elements

are satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent

interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public

interest. *Bruns v. Mayhew*, 750 F.3d 61, 65 (1st Cir. 2014).

If a plaintiff fails to provide sufficient competent evidence of these factors, preliminary

injunctive relief should be denied. *See Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d

66 (1st Cir. 2001), *aff'd*, 538 U.S. 644 (2003).  The court should not issue an injunction based

upon conclusory allegations from a verified complaint. *See American Passage Media Corp. v.

Cass Commun., Inc.,* 750 F.2d 1470, 1473-74 (9th Cir. 1985) (reversing PI supported by

plaintiffs' conclusory affidavits); *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374,

1377 (9th Cir. 1985) (same).  Moreover, the state laws at issue are presumptively valid, *see

Davies Warehouse Co. v. Bowles,* 321 U.S. 144, 153 (1944), and plaintiff bears a heavy burden

of proving the unconstitutionality of any of these laws.

I.    **The MRP has not shown a reasonable likelihood of success on the merits of its claim
      that determining the results of the primary election using the ranked-choice voting
      method impermissibly burdens its First Amendment rights of association.**

     A.    <u>Level of scrutiny</u>

The Supreme Court has long recognized that "there must be a substantial regulation of

elections if they are to be fair and honest and if some sort of order, rather than chaos, is to

accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974).  To achieve

these objectives, states have enacted "comprehensive, and in many respects complex, election

codes" regulating the time, place and manner of holding primary and general elections for both

state and federal offices, including with respect to the "registration and qualifications of voters, and the selection and qualifications of candidates." *Id.* Provisions of state election laws will "inevitably affect[] – at least to some degree – the individual's right to vote and his [or her] right to associate with others for political ends. Nonetheless, the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

There is no "hard-and-fast rule" for evaluating the constitutionality of state laws regulating the election process. *Werme v. Merrill*, 84 F.3d 479, 483 (1st Cir. 1996). Instead, the Supreme Court has adopted a balancing test under which the degree of scrutiny depends on the severity of the burden imposed. The court must first "consider the character and magnitude of the asserted injury" to First Amendment rights asserted by the plaintiff, and "then evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.*, quoting *Anderson*, 460 U.S. at 789, *accord Libertarian Party of Me. v. Dunlap*, 2016 WL 3039715 (D. Me. 2016). If the burden on First Amendment rights imposed by the State's regulation imposes is deemed "severe," then the State must show that the regulation is "narrowly drawn to advance a state interest of compelling importance. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). By contrast, when State election law "imposes only reasonable, nondiscriminatory restrictions" on First Amendment rights, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.*

The MRP has assumed a severe burden here without proving it, or demonstrating a likelihood of being able to prove it – or any burden whatsoever on its rights of association.

B.     The RCV method of determining the results of the primary election imposes no burden on the Maine Republican Party's First Amendment rights of association.

The RCV law does not affect in any way *who is eligible to participate* in choosing a party's nominee.[5]  Nor does it affect the method by which party candidates qualify for the primary ballot and thus does not alter or influence the field of candidates that party voters get to choose among when voting at the primary election.  The cases that MRP relies upon involved state primary laws that did have such effects and thus imposed burdens on the party's associational rights.  *See, e.g., California Democratic Party v. Jones*, 530 U.S. 567 (2000) (California's blanket primary law violated party's freedom of association because it forced parties to have their nominees chosen by unenrolled voters and voters enrolled in other parties); *Tashjian v. Republican Party of Conn.,* 470 U.S. 208 (1986) (state law that prevented party from inviting unenrolled voters to participate in its primary impermissibly burdened party's associational rights).

The RCV law likewise does not regulate any internal processes of the party that might implicate its associational rights.  *Cf. Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214 (1989) (state laws determining make-up of party committees); *Democratic Party of U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107 (1981) (open primary permissible but compelling national party to seat delegates at its convention contrary to party rules was not). Under Maine law, the MRP is free to select its officers by whatever method it chooses – including the RCV method it has chosen in its Rule 2.3(c).  ECF 11-1 at 3.[6]

---

[5]  As noted above, Maine's election law gives qualified political parties such as the MRP control over who participates in their primary election.  *See* 21-A M.R.S.A. § 340 (only party members may vote unless the party notifies the Secretary of State by February 1st of election year that it wishes to allow unenrolled voters to participate as well).

[6]  The MRP's rules further provide that in a presidential election year, any candidate "must garner a majority of votes" cast in order to prevail at the party convention, and if no candidate attains a majority "a

The state laws and regulations at issue in the above cases imposed varying degrees of burden on a party's associational rights.  The RCV law, by contrast, involves the mechanics of conducting a state-run election.  It is a neutral regulation of the State's election process by which Republican Party voters choose among Republican Party candidates who qualified to get their names on the primary ballot by gathering the requisite number of signatures from Republican Party voters on their nominating petitions.  The Maine Republican Party is not forced to affiliate or associate with any group of voters other than its own members.

The MRP has identified no case, and the Secretary is not aware of any, in which an appellate court has held that the method by which ballots are counted imposes a burden on a party's First Amendment rights of association. [7]

States have "broad power to prescribe" the times, places and manner of holding elections for state and federal offices.  *Clingman v. Beaver*, 544 U.S. 581, 586 (2005).  And states may require primaries as the exclusive method by which parties must select their nominees.  *New York State Bd. of Elections*, 552 U.S. at 203; *Jones*, 530 U.S. at 572; and *American Party of Texas v. White*, 415 U.S. 767, 781 (1974).  Under direct primary laws such as Maine's, the State conducts the election, at taxpayer expense, so that party members may choose their party's nominee.  The nominee selected automatically gains a place on the general election ballot.  21-A

---

runoff election shall be conducted between the candidates with the most votes."  ECF 11-1 at 15 (Rule 16.2(b)).

[7] Some of the early direct primary laws included a requirement that voters make a first and second choice if there were more than two candidates on the ballot, and provided a method of counting that is similar to RCV.  The appellate courts upheld such provisions when challenged.  *See, e.g., State v. Haskell*, 72 Fla. 176, 72 So. 651, 653 (1916) (if no candidate received majority of first choice votes, lowest ranked candidates were eliminated, and second choice votes on those ballots were added to first choice tally for top two candidates); *Adams v. Lansdon*, 18 Idaho 483, 110 P. 280, 282-83 (1910) (if no candidate received a majority of first choice votes, then second choice votes would be added to totals); *State ex rel. Zent v. Nichols*, 50 Wash. 508, 97 P. 728, 733 (1908) (requiring candidate to receive more than 40% of the first choice votes); *Kelso v. Cook*, 184 Ind. 173, 110 N.E. 987, 989, 998 (1916) (provision for second choice votes designed to preserve some features of party convention system and to "bring about a result satisfactory to the greatest number of voters").

M.R.S.A. § 301(2) & 331.  When the State gives the party a role in the election process "by giving certain parties the right to have their candidates appear with party endorsement on the general-election ballot… the State acquires a legitimate governmental interest in assuring the fairness of the party's nominating process, enabling it to prescribe what that process must be." *New York State Bd. of Elections*, 552 U.S. at 203 (citation omitted).  The party's rights to choose its candidate-selection process are "circumscribed" in this context because the primary is a state-run election.  *Id.*

In running the primary, the State is not constitutionally obligated to choose rules that align with the parties' preferences.  Whether one party would prefer a different method of casting or counting ballots at a state-run primary does not implicate that party's associational rights.  The party obtains automatic and exclusive access to the general election ballot – meaning only one candidate with that party's designation will appear on the general election ballot – in exchange for the state running the primary election.  The mechanics of the primary election process are for the State to determine, utilizing neutral, nondiscriminatory means.

The fact that the RCV method may – or may not – affect who wins the upcoming primary election does not mean that the RCV affects MRP's First Amendment rights of association.  Changing any number of rules governing the election – such as holding the election on a different day of the week or weekend, or extending or reducing the hours that polls are open – may or may not affect the results of any election and may or may not be favored by one particular party.  But those facts, alone, do not burden a party's First Amendment rights of association.

The party's rights of association are implicated, as shown above, when the State forces the party to affiliate with non-party members in selecting the party's nominees, *Jones*, 530 U.S.

at 577, prohibits the party from inviting unenrolled voters to participate in its primary, *Tashjean*, 479 U.S. at 225,  or imposes rules governing internal leadership structure of the party, *Eu*, 489 U.S. at 229-30, or the process of selecting its national convention delegates, *La Follette*, 450 U.S. at 122-24.[8]  The mere fact that certain state and federal office-holders in Maine – once elected at the general election – automatically become voting members of the MRP's State Committee or have the ability to appoint a member to that Committee is not a requirement imposed by the State, nor is it a direct consequence of how the primary is conducted.  It is a matter that the party can control by adopting or amending its own internal rules.

C.    The State's interests in implementing RCV for the primary election are compelling or sufficiently important to justify any negligible burden on MRP's First Amendment rights of association.

Because any burden on MRP's associational rights is slight at best, the State need not assert a compelling interest to support implementing RCV in the primary election.  *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 458 (2008).  Given the "lack of magnitude" of the alleged injury to MRP's rights of association, the State need only show a rational basis for RCV.  *Werme*, 84 F.3d at 485; *see also Anderson*, 460 U.S. at 788 (State's important regulatory interests sufficient to justify reasonable nondiscriminatory restrictions on election procedures).  Many of the State's interests implicated here have been recognized as compelling, and they are certainly important enough to justify the negligible burden imposed on the MRP by applying RCV to the primary election.

---

[8]  Other state requirements directly affecting who may participate in a primary election have been upheld. *E.g., Clingman v. Beaver*, 544 U.S. 581, 587 (2005) (state law forbidding parties from inviting members of other parties to participate in their primary places no heavy burden on parties' associational rights); and *Rosario v. Rockefeller*, 410 U.S. 752 (1973) (upholding state requirement that voter must have enrolled in party of his or her choice at least 30 days before previous general election in order to vote in next party primary).

The Supreme Court has long recognized that states have a compelling interest in "substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer*, 415 U.S. at 730.  Applying the RCV law as the method of counting all the ballots cast by members of all the parties qualified to participate in the primary election furthers that compelling interest.  As explained by the Secretary of State in his Declaration, elections in Maine are administered at the local level by officials in 500 separate voting jurisdictions.  ECF 13, ¶¶ 14-16.  Voters of all parties go to the same local polling places, check in with the same election clerks, and place their ballots into the same ballot boxes or tabulator machines in each municipality.  If different rules were to apply to the election process depending on the voter's party of enrollment, chaos could ensue.

Preserving the integrity and reliability of the electoral process is also recognized as a compelling interest that supports requiring parties to nominate candidates through a primary election run by the State, as opposed to party caucuses or conventions.  *American Party of Texas*, 415 U.S. at 779-780; *Alaska Independence Party*, 545 F.3d at 1180.  The RCV law advances this interest by applying a uniform set of State rules to primary election contests involving more than two candidates, regardless of party.  ECF 13, ¶15.  To allow each political party to tailor the rules governing the conduct of the primary election to suit its own preferences, as the MRP suggests, would defeat the State's compelling interest that underlies the requirement to have a state-run primary as the sole method of choosing the nominees of a political party who will appear on the general election ballot.

The State also has a legitimate interest in ensuring administrative efficiency in the election process, s*ee e.g., Burdick*, 504 U.S. at 438-439 (discussing limitations on write-in voting); *Rosario*, 410 U.S. at 760 (state justified in imposing cut-off for party enrollment before

primary), and in avoiding voter confusion and voter frustration that could discourage participation in the electoral process.  ECF 13 at ¶¶ 17-19.  *See Reynolds v. Sims*, 377 U.S. 533, 555 (1964) (State has serious obligation to protect rights of voters to cast meaningful ballot).

In short, the State's interests far outweigh any minimal burden on MRP's First Amendment Rights.  *See, e.g.*, *Utah Republican Party v. Cox*, 885 F.3d 1219, 1235-37, 1241-43 (10th Cir. 2018) (State's important regulatory interests of managing elections in controlled manner, increasing voter participation, and increasing access to ballot justified only minimal burden on political party's First Amendment associational rights); *Werme*, 84 F.3d at 486-87 (state's method of selecting ballot clerks advanced important interests in dispelling confusion, warding off fraud and ensuring administrative efficiency at the polls).

## II.    The challenged RCV law will not cause immediate irreparable harm to the MRP.

Plaintiffs have the burden to prove "immediate and irreparable harm" in the absence of an injunction.  "[I]rreparable harm is not assumed; it must be demonstrated" by those seeking emergency relief.  *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6-7 (1st Cir. 1991).  This is true no matter what type of injury is alleged.  In other words, "that [plaintiffs assert] First Amendment rights does not automatically require a finding of irreparable injury."  *Public Service Co. of N.H. v. Town of West Newbury*, 835 F.2d 380, 382 (1st Cir. 1987) (quotations omitted).

The plaintiff shoulders the same heavy burden as any other litigant seeking to disturb the *status quo*, and MRP cannot meet this burden.  Indeed, MRP has failed to show that it has suffered or will suffer any cognizable injury to its First Amendment rights, let alone irreparable harm.

The possibility that voters will make a different first choice among Republican Party candidates – and thus allegedly select an inappropriate or inadequate "standard bearer" for the

party – if they rank preferences using RCV as opposed to voting for only one candidate who may win by plurality is based on "sheer speculation" that cannot support MRP's First Amendment claim. *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 454 (2008) (rejecting First Amendment challenge based on speculative possibility of harm).

Indeed, MRP's use of ranked-choice voting to select its own officers belies its claim that its First Amendment rights of association would be harmed if the RCV method were used at the upcoming June primary.  MRP's own organizational rules – the method by which it chooses its leaders – have embraced this method as a good way to pick the party leadership.

## III.    Plaintiff's claims fail the "balance of harms" and "public interest" prongs.

The harm to MRP's First Amendment rights is non-existent or negligible at best.  Even assuming arguendo that the RCV law slightly burdened MRP's First Amendment right of association, any harm to MRP is far outweighed by the harm an injunction would cause in terms of disruption of the primary election, confusion among election officials, voter confusion, and voter frustration.  Enjoining the implementation of RCV at this late date would harm the public interest in smooth and orderly elections.

The MRP waited until just over a month before the primary to file this lawsuit, even though the RCV law was enacted by the voters in November 2016 and took effect 16 months ago, and even though the Legislature's attempted postponement of RCV was suspended by a people's veto petition that was filed three months ago.  Even assuming, arguendo, that MRP's claims could not have been adjudicated until after the party adopted a plurality voting rule at its convention, there is no apparent reason why the Republican state convention could not have been held much closer to March 1st, as provided in 21-A M.R.S.A. § 321.  According to the MRP's bylaws, the Maine Republican State Committee, charged with providing "direction and

leadership" to the party, meets six to eight times a year, and special meetings may be held at any time upon the call of the Chairman.  ECF 11-2 at 1, 6 (MRP Bylaws, Art. II & VII, § 1). Moreover, it was not the adoption of Rule 16.0 that created the alleged burden on the party's associational rights, but rather the State's implementation of RCV for the upcoming primary, which began in earnest over two months ago.

MRP's delayed filing – without notice, and only a month before the primary, when ballots have already been printed and distributed, and absentee and overseas voters have started to mark their ballots – is unreasonable and should preclude the grant of emergency equitable relief.  The balance of equities does not favor the MRP, given that the "emergency" claimed here was "largely one of their own making."  *Respect Maine PAC v. McKee*, 622 F.3d 13, 16 (1st Cir. 2010); *see also League of Women Voters v. Diamond*, 923 F. Supp. 266, 275 (D. Me 1996) (denying injunctive relief where plaintiffs created alleged emergency situation by their own delay in bringing action).

Courts are loath to grant injunctions in election cases, in particular, because the harm falls on all citizens of the State.  *See Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) (citing cases).  The harm to the public from such last-minute disruption of expectations far outweighs any speculative injury alleged by MRP.  Indeed, the mere filing of the lawsuit causes harm to the public interest by fostering voter confusion about a new method of determining elections that has never before been implemented statewide.  *See Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam) ("court orders affecting elections can themselves result in voter confusion and consequent incentive [for voters] to remain away from the polls"; "as an election draws closer, that risk will increase"); *accord Respect Maine PAC*, 622 F.3d at 16 (noting "harm to the public interest from the chaos that will ensue if the Maine election laws …

are invalidated by a court order in the crucial final weeks before an election"); *Colon-Marrero v. Conty-Perez*, 703 F.3d 134, 139 n. 9 (1st cir. 2012) (even where plaintiff has demonstrated a likelihood of success, issuing an injunction on eve of election is extraordinary remedy with risks of its own).[9]

Finally, the public interest is best served by giving full effect to the duly enacted laws of the State, especially "a popularly enacted election process that has never been carried out." *Washington State Grange*, 552 U.S. at 458.  To enjoin enforcement of such a law would be an "extraordinary and precipitous nullification of the will of the people" without any proof that the law severely (or even slightly) burdens MRP's associational rights.  *Id.*  As the Superior Court concluded last month in *Comm. for Ranked-choice Voting*, Docket No. AUGSC-CV-18-24 (Me. Super. Ct., Ken. Cty.  Apr. 3, 2018), at 10:

> As a result of the signatures collected in support of the People's Veto, it has been understood by candidates, officials, and the general public alike that the primary on June 12, 2018 will be decided by ranked-choice voting. ...  The general public voted for just such a process in November 2016.  To stop implementation now, ten weeks prior to election day, could cause the irreparable harm of not being able to implement the will of the voters by the June 12, 2018 election day.

The June primary election is now less than four weeks away.

Uniform implementation of the RCV law greatly benefits the public by assuring an orderly election conducted in the same manner for all qualified state parties.  The status quo should be kept in place until this case is resolved.

---

[9]  *See Williams v. Rhodes*, 393 U.S. 23, 34-35 (1969) (denying requested relief despite unconstitutionality of statute, because confusion that would attend such a last-minute change poses risk of interference with rights of other citizens and "relief cannot be granted without serious disruption of election process").

CONCLUSION

For the foregoing reasons, the MRP's Motion for Preliminary Injunction should be denied.

Dated:  May 17, 2018                            Respectfully submitted,


/s/ PHYLLIS GARDINER
PHYLLIS GARDINER
Assistant Attorney General
THOMAS A. KNOWLTON
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145
phyllis.gardiner@maine.gov
thomas.a.knowlton@maine.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 17th day of May, 2018, I electronically filed the above

document with the Clerk of Court using the CM/ECF system which will send notification of such

filing to the following:

      JOSHUA D. DUNLAP, ESQ.
      jdunlap@pierceatwood.com

      JAMES G. MONTELEONE, ESQ.
      jmonteleone@bernsteinshur.com

      To my knowledge, there are no non-registered parties or attorneys participating in this

case.

                    /s/ PHYLLIS GARDINER
                    PHYLLIS GARDINER
                    Assistant Attorney General
                    Office of the Attorney General
                    6 State House Station
                    Augusta, Maine  04333-0006
                    Tel.  (207) 626-8800
                    Fax (207) 287-3145
                    phyllis.gardiner@maine.gov