UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| MAINE REPUBLICAN PARTY,<br><br>                           Plaintiff,<br><br>v.<br><br>MATTHEW DUNLAP, in his official capacity as Secretary of State for the State of Maine,<br><br>                           Defendant. | Civil Action No. 18-cv-00179-JDL |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

The opposition filed by the Secretary of State rests primarily on two assertions, neither of which is supportable. Accordingly, an injunction is appropriate.

First, the Secretary wrongly suggests that ranked choice voting simply changes the "mechanics" of the election, and therefore imposes no burden on the Maine Republican Party. Opp. at 11, 16; *id.* at 14. Every justice on the Supreme Judicial Court, however, found that it changes the outcome of elections. *Opinion of the Justices*, 2017 ME 100, ¶¶ 62-67. Changing the outcome of just one primary election is a severe burden. *Calif. Democratic Party v. Jones*, 530 U.S. 567, 580 (2000). Would the Democratic Party be different if Senator Sanders had been at the helm in 2016, rather than Senator Clinton? Would the Republican Party be different if Governor Kasich were the nominee, rather than now-President Trump? The answer, obviously, is yes. Despite violating Local Rule 7(d) by exceeding his page limits, however, the Secretary could not identify any compelling interest served by the RCV Act that justifies changing the Party's character in this way. The interests asserted by the State are either so broad as to negate the Party's right to choose its nominees or are not advanced in any way by ranked choice voting.

Second, the Secretary misconstrues the equities of an injunction.  Opp. at 19-22.  The Secretary himself debunks the notion that the Party filed its suit too late by explaining that it took until April 17, 2018, for courts to determine that the RCV Act applied to the 2018 primaries as a matter of state law. *Id.* at 5-8.  The Secretary even explains that he did not promulgate final rules for ranked choice voting until *a week after* the Party filed suit.  Dkt. No. 13, ¶ 8.  The People's Veto created this compressed timeline, not the Party.  Further, voter confusion would arise if the Court enforced an unconstitutional law, not if it enjoined an unconstitutional law.

## I.    The Party Has Demonstrated a Substantial Likelihood of Success on the Merits.

### A.    Ranked Choice Voting Is Designed to Change the Character of the Party.

The Secretary wrongly claims that the alleged burden is the election of "an inappropriate or inadequate 'standard bearer,'" which he views as speculative.  Opp. at 19-20.  The problem is not that the standard bearer may be *inadequate*, but that the standard bearer may be *different*.

Changing a Party's nominee by imposing a new vote threshold changes the Party's character.  One need only consider what would have happened to the Republican Party – and the country – if Lincoln had not been its nominee in 1860.  *Jones*, 530 U.S. at 580.  In this case, the Party has specifically articulated the wide-ranging implications of changing the Party's nominee.  Changing the Party's nominee affects the leadership of the Party – both the identity of the Party's recognized leader(s), as well as the composition of its official governing body.  Dkt. No. 1, ¶ 33.  It also can change the message of the Party by changing its most visible representatives and its platform.  *Id.* ¶ 34.[1]  Outside interest groups should not be allowed to force this on the Party.

Ranked choice voting is not just a set of "rules for counting ballots," Opp. at 11, that changes outcomes by happenstance.  Unlike changing the date or hours of an election, *id.* at 16,

---

[1] It is no answer to say that the Party could mitigate some of this impact by changing its rules so that nominees have less say over the Party.  Opp. at 17.  Compelling that change would itself create a severe burden.  *Eu v. San Francisco Cty. Democratic Central Comm.*, 489 U.S. 214, 230 (1989).

{W6704110.2}                                      2

ranked choice voting was designed to change election outcomes and messages. Dkt. No. 1, ¶ 12. The SJC has already rejected the argument that the RCV Act is merely procedural. *Opinion of the Justices*, 2017 ME 100, ¶ 65 ("the Act is not simply another method of" counting ballots).[2] Changing election outcomes and election messaging is the only purpose the RCV Act serves.

Changing the character of the Party by changing its election process, and therefore its nominee, strikes at the heart of the Party's right to freedom of association. That is why the Supreme Court has repeatedly affirmed that the First Amendment protects a party's "determination . . . of the structure which best allows it to pursue its political goals," *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 224 (1986), including, specifically, nomination procedures, *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 202 (2008).

Moreover, the burden on the Party is far from speculative or conclusory. Because (1) the SJC has said that the RCV Act can change election outcomes, (2) the Supreme Court has recognized the burden of changing a party's nominee, and (3) the Party has submitted a verified complaint identifying how that change would affect its leadership and message, this case is very different from those in which there were factual questions regarding the alleged burden. *See Washington State Grange v. Washington State Republican Party*, 552 U.S 442, 455 (2008) (involving a question of fact regarding whether voters would be confused by a jungle primary).

The Secretary argues that regulations of primaries are suspect only if they affect who is eligible to participate in a primary, or the method by which candidates qualify for the ballot. Opp. at 1, 14. This reading of the Supreme Court's precedent loses sight of the forest for the trees. Cases like *Jones* and *Tashjian* are specific applications of the broad rights afforded to political parties by the First Amendment, as the Party has previously fully explained. Motion at

---

[2] *See* Br. of League of Women Voters, *In re Request for Opinion of the Justices*, No. OJ-17-1, at 3 (characterizing ranked choice voting as a "new method of tabulation"), *available at* http://www.courts. maine.gov/ maine_courts/supreme/senate_question_2017/brief_lwvcce.pdf (last visited May 17, 2018).

8-10, 14. Together, those cases unequivocally establish the principle that the Party's freedom to choose a nomination process may not be severely burdened, except as necessary to ensure free and fair elections. *Id.* Burdens may come in many forms, such as forced association, *Jones*, 530 U.S. at 574, or restrictions on the Party's free choice in how to choose its leaders, *Eu*, 489 U.S. at 230. Ranked choice voting is an example of the latter, and *Eu* therefore controls the outcome of this case. It would be truly extraordinary to conclude that *Eu* only protects the selection of state committee members, and not party nominees. Opp. at 14. As the Supreme Court recognizes, nomination of party candidates is the most important activity a political party undertakes and therefore garners the most vigorous protection. *Jones*, 530 U.S. at 575. If the Party's process for selecting state committee members is protected, so is its nomination process.[3]

### B. Replacing Plurality Voting Did Not Advance Any of the State's Interests.

The mere fact that the State has a role in the election process does not mean that it is free to change the basic threshold for determining the Party's nominee. *Jones*, 530 U.S. at 572-73 (party primaries are not "wholly public affairs"). To find otherwise would be contrary to *Jones*, and would swallow the rule that party primaries are protected under the First Amendment. The State can adopt true time, place, and manner regulations (such as ballot layouts, voting locations, etc.), but can only impose a severe burden on the rights of parties if "necessary to ensure an election that is orderly and fair." *Eu*, 489 U.S. at 233. Moreover, any asserted state interest must be assessed "in the circumstances of this case," not in the abstract. *Jones*, 530 U.S. at 584.

---

[3] *See Cousins v. Wigoda*, 419 U.S. 477, 489 (1975) (delegate selection protected because it affected nomination). In any event, selecting the Party's nominees also affects the composition of the Party's state committee. Dkt. No. 1, ¶ 10. Even under the Secretary's parsimonious reading of *Eu*, therefore, that case demonstrates that the RCV Act creates a severe burden on the Party. Further, contrary to the Secretary's representations, the Party does not use ranked choice voting for state committee elections. Instead, like a caucus, voting and campaigning occurs in one room; there are multiple ballots, if needed; and there is no ranking of candidates. Dkt. No. 11-1 at 3. Even if the Party did use ranked choice voting for the committee, there would be rational reasons for treating nominations differently because of the delays, expense, and security issues raised by state-wide implementation for primaries. Dkt. No. 1, ¶ 37.

An interest in "fair and honest elections," Opp. at 18, or "avoiding voter confusion," *id.* at 19, does not justify the burden here.  While requiring primaries rather than caucuses serves a compelling interest by ensuring free elections rather than corrupt deals, *Jones*, 530 U.S. at 572, that is not at issue here.[4]  The real question is whether the use of plurality voting in a primary is confusing, unfair, or dishonest.  The Secretary cannot make that argument.  If it were, then the SJC has *required* the use of a confusing, unfair, and dishonest system in the general election by barring ranked choice voting in that context.  *Opinion of the Justices*, 2017 ME 100, ¶ 68.

Uniformity of election rules and administrative efficiency, Opp. at 18, also do not justify the RCV Act.  At the time ranked choice voting was adopted, election rules were uniform: plurality voting applied to all elections.  The RCV Act undermined (not advanced) uniformity by instituting ranked choice voting for some elections even though it was precluded for others.  *Id.* Indeed, the Secretary concedes that there will not be uniformity *even in the primary*, no matter how the Court rules:  ranked choice ballots are used in only two of the Party's primary contests, Dkt. No. 13, ¶ 7, and ranked choice rules apply only in races with at least three candidates, 29-250 Chap. 535, § 1.  Moreover, the Secretary does not (because he cannot) maintain an argument that ranked choice voting is more efficient, understandable, or affordable than plurality voting.[5]

The Secretary protests that elections are not "an a la carte menu," Opp. at 11, and suggests a parade of horribles if a party is allowed "to tailor the rules" governing its primary, *id.* at 18. But the Secretary's own explanation of existing primary laws shows that Maine law has already been amended in response to Supreme Court cases (the very precedent relied upon by the

---

[4] Because the Party agrees that primaries serve a compelling interest, the Secretary misses the mark by relying on cases affirming that primaries prevent "the grossest frauds."  *Kelso v. Cook*, 110 N.E. 987, 996 (Ind. 1916).  *See Utah Republican Party v. Cox*, 885 F.3d 1219, 1231 (10th Cir. 2018).  Those cases did not address whether changing the threshold for election in a primary violates the First Amendment.

[5] The State would have much stronger interests in uniformity and efficiency if the Party were asking the State to take on a greater burden, such as conducting runoff elections.  Here, however, the Party asks that the State do less than it otherwise would.

Party) to accommodate parties' choice whether to allow unenrolled voters to participate in their primaries.  Opp. at 2-3; 21-A M.R.S. § 340.  If party choice is manageable there, it is manageable here.  Indeed, Section 340 is the template that should have been followed.  Parties should have the option to participate in ranked choice voting, and a deadline for that choice.

## II.     Given the Harm to the Party, The Balance of the Equities Favors an Injunction.

Because the RCV Act changes the outcome of elections and does not advance the interests asserted by the State, the final question is whether the Court should nevertheless enforce this unconstitutional law simply because of the timing of this case.  The Court should not.

The Secretary is simply wrong when he asserts that a violation of First Amendment rights does not automatically require a finding of irreparable injury.  Mere *assertion* of a First Amendment claim may not be enough, but irreparable injury is presumed once the Party shows a substantial likelihood of success on such a claim.  *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F. 3d 1, 15 (1st Cir. 2012).  The Secretary never mentions *Sindicato*.

There is no strong countervailing interest in this case.  An injunction would not lead to chaos.  The Secretary's predictions of doom are baseless speculation.  He never acknowledges that the relief sought *would not change anything municipal election officials have to do*: per the Secretary's rules, they will already "record the first choice votes cast for all ranked-choice voting contests."  29-250 Chap. 535, ¶ 4.  They need do no more and no less.[6]  The Secretary simply would not conduct centralized counting.  (Indeed, if the Secretary wanted to spend the additional money and effort necessary to do so, he could; the Party simply asks that the candidate obtaining the first plurality be deemed the nominee.)  Nor would an injunction create voter confusion.  No matter what system is used, voters will still vote for their favorite candidate first.  Dkt. No. 13-1

---

[6] Because state officials need take no affirmative steps to comply with an injunction, *Colon-Marrero v. Conty-Perez*, 703 F.3d 134 (1st Cir. 2012), is inapposite.  That case would have required officials to reinstate more than 300,000 voters onto the rolls within days of the election.  *Id.* at 136.

(ballot instructing voters to vote in the first column for their first choice). Any expectation that subsequent preferences will be counted would be simply the result of public interest groups' pursuit of an unlawful scheme. Implementing an unconstitutional law that is later struck down would lead to more voter frustration than an injunction; indeed, it risks delegitimizing the Party's candidate after the general election is underway. Finally, just because an unconstitutional law is the "will of the people," Opp. at 22, alone does not mean that it should be enforced. Such an overbroad rationale would preclude an injunction in any case involving a state law. The ultimate will of the people is the Constitution, and protecting it protects the public interest. *Westfield High Sch. L.I.F.E. Club v. Westfield*, 249 F. Supp. 2d 98, 128 (D. Mass. 2003).

The Court should not disregard the severe injury to the Party because the Party could not file suit until May 4, 2018. The Party could not bring suit until the adoption of Rule 16 because it would not have been ripe.[7] Even if it could have, state law issues were not resolved until April 17, 2018 (just six weeks after the People's Veto), Dkt. No. 1, ¶¶ 18, 20; bringing suit earlier could have presented abstention issues. The Party therefore brought its federal constitutional claims at its first opportunity. As it happens, that occurred before the Secretary's rules had even been finalized. Dkt. No. 13, ¶ 8. Again, *Sindicato* – not distinguished by the Secretary – controls. Where the law is new (2 months old here; 7 ½ months old in *Sindicato*), the new election procedure has not been used previously, and no substantial disruption will occur, the Court should not leave an unconstitutional law in place. *Sindicato*, 699 F.3d at 16.

## III.    Conclusion

The Court should enjoin the implementation of a law that violates the Party's rights.

---

[7] The notion that the Party could have held its convention sooner, in reaction to the People's Veto certified on March 5, does not pass the straight face test. Biennial municipal caucuses (at which delegates are chosen) were being conducted up through March 20, 2018, as allowed by state law, *see* 21-A M.R.S. § 301(1); the platform was not finalized until April 1st, Dkt. No. 11-1 at 12; and arrangements with convention facilities had been made long in advance.

Dated at Portland, Maine this 21st day of May, 2018.

                                        Respectfully submitted,

                                        /s/ Joshua D. Dunlap_____
                                        Ann R. Robinson
                                        Joshua D. Dunlap
                                        PIERCE ATWOOD LLP
                                        Merrill's Wharf
                                        254 Commercial St.
                                        Portland, ME 04101
                                        Phone: 207-791-1100
                                        Email: arobinson@pierceatwood.com
                                        Email: jdunlap@pierceatwood.com

                                        *Attorneys for Plaintiff Maine Republican Party*

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2018, I electronically filed the foregoing document entitled Reply in Support of Plaintiff's Motion for Preliminary Injunction with the Clerk of Court using the CM/ECF system which will distribute a copy of the document to all counsel of record.

DATED:  May 21, 2018

/s/ Joshua D. Dunlap
Ann R. Robinson
Joshua D. Dunlap
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial St.
Portland, ME 04101
Phone: 207-791-1100
Email: arobinson@pierceatwood.com
Email: jdunlap@pierceatwood.com

*Attorneys for Plaintiff Maine Republican Party*

.