# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| **MAINE REPUBLICAN PARTY**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) 1:18-cv-00179-JDL |
| **MATTHEW DUNLAP,** *in his* | ) |
| *official capacity as Secretary of* | ) |
| *State for the State of Maine*, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Ranked-choice voting is set to be employed in the Maine primary election on June 12, 2018, following almost two years of legislative and litigated battles between its proponents and detractors. Against this backdrop, the Maine Republican Party[1] filed this civil action on May 4, 2018, and simultaneously moved for a preliminary injunction (ECF No. 3) seeking to prevent the Defendant, Matthew Dunlap, Secretary of State for the State of Maine (the "Secretary"), from implementing ranked-choice voting for the Party's June 12 primary. Also on May 4, the Party adopted a rule requiring that its nominees for elected office be selected using a simple plurality system. In its verified complaint, the Party contends that ranked-choice voting will unconstitutionally infringe on its right to freedom of association guaranteed by the First Amendment of the United States Constitution, as incorporated against the State by the Fourteenth Amendment. For the reasons discussed below, I deny the Motion for Preliminary Injunction.

---

[1] The Maine Republican Party is alternatively referred to as the "Maine Republican Party" and the "Party."

# I. BACKGROUND

"The Ranked-Choice Voting Act" (the "RCV Act") is currently in effect for the June 12, 2018, primaries. L.D. 1557, §§ 1-6 (referred to the voters, 127th Legis. 2016) (effective Jan. 7, 2017) (codified at 21-A M.R.S.A. §§ 1(27-C), 1(35-A), 601(2)(J), 722(1), 723-A (2018)). Previously, Maine law required a single-choice voting system in primary and general elections, in which voters voted for a single candidate, and the candidate with the most votes (but not necessarily a majority of votes) won. *See Opinion of the Justices*, 162 A.3d 188, 197 (Me. 2017). That system is referred to by the parties as a "plurality" system.

The RCV Act defines ranked-choice voting as "the method of casting and tabulating votes in which voters rank candidates in order of preference, tabulation proceeds in sequential rounds in which last-place candidates are defeated and the candidate with the most votes in the final round is elected." L.D. 1557, § 2 (codified at 21-A M.R.S.A. § 1(35-A)). Under ranked-choice voting, the first round proceeds much in the same way it did under the plurality system: Each voter's first choice vote is counted, and if any candidate captures an outright majority of the first choice votes that candidate wins. *See* ECF No. 1 at ¶ 10. But, if no candidate captures a majority of the first choice votes, there is an instant run-off. *See id.* The candidate with the fewest first choice votes is eliminated, and all of the ballots that listed him or her as the first choice candidate are counted for their second choice candidate. *See id.* The process repeats and eliminates more last place candidates until one candidate receives a majority of the votes. *See id.*

Only voters enrolled in the Maine Republican Party will be eligible to cast a vote in the Party's primary on June 12. *See* ECF No. 13 ¶ 7. Because the ranked-choice voting process is triggered in races with more than two candidates, only two of the upcoming contests in the Republican primary—the contests for Governor of the State of Maine and Representative to the Maine Legislature in House District 75—will be subject to the ranked-choice voting process during the June 2018 primary. *See id.*

Following the adoption of the RCV Act by public referendum in 2016, there were legislative efforts to repeal or delay its implementation.[2] The RCV Act's complex post-adoption legislative and judicial history is chronicled in two opinions of the Maine Supreme Judicial Court related to it: *Opinion of the Justices*, 162 A.3d 188 (Me. 2017) and *Maine Senate v. Secretary of State*, --- A.3d ---, 2018 WL 1832874 (Me. April 17, 2018). And, as the Court explained in *Maine Senate*: "The history of ranked-choice voting in Maine to date could provide the substance of an entire civics course on the creation of statutory law in the State of Maine." *Maine Senate*, 2018 WL 1832874, at *1.[3]

---

[2] Although the RCV Act is currently in effect as applied to primary elections, two issues cloud its future: First, if the legislative measure titled "An Act to Implement Ranked-Choice Voting in 2021" is not vetoed by the statewide vote on June 12, 2018, then all future ranked-choice elections will be delayed until 2021; even then, if the State Legislature fails to amend the Maine Constitution to permit ranked-choice voting in certain elections before 2021, all of the statutory ranked-choice voting provisions will be repealed. *See* P.L. 2017, ch. 316, §§ 1-14 (effective Feb. 5, 2018); *see also Maine Senate*, 2018 WL 1832874, at *2. Second, even if "An Act to Implement Ranked-Choice Voting in 2021" is vetoed by statewide vote on June 12, 2018, it is unclear whether the RCV Act will be implemented in the general elections in November 2018; in its non-binding Advisory Opinion, the Maine Supreme Judicial Court found that the aspects of the RCV Act related to the election of the Governor and members of the Maine Legislature conflict with the State Constitution. *See Opinion of the Justices*, 162 A.3d at 209-11.

[3] For a thorough explanation of the RCV Act's legislative and judicial history, *see Maine Senate*, 2018 WL 1832874, at *1-5.

In *Opinion of the Justices*, the Supreme Judicial Court determined that portions of the RCV Act violate several provisions of the Maine Constitution (Art. IV, pt. 1, § 5, Art. IV, pt. 2, § 4, and Art. V, pt. 1, § 3), which, the Court opined, require plurality voting in general elections for Maine's State Senators and Representatives, and for Maine's Governor. *See* 162 A.3d at 209-11. Accordingly, as of this decision, the ranked-choice voting system is only employed in primary elections for these offices.

As part of its Party governance, the Maine Republican Party has promulgated rules and bylaws. *See* ECF Nos. 11-1, 11-2. On May 4, 2018, the Maine Republican Party adopted "Rule 16" at its 2018 biennial state convention. ECF No. 1 at ¶ 27. The rule provides that "The Maine Republican Party's nominees for elected office, including United States Senator, United States Representative, Governor of the State of Maine, State Senator, and State Representative, shall be chosen by a plurality of votes cast." *Id.* at ¶ 29; *see also* ECF No. 11-1 at 9. The Maine Republican Party contends that the May 4 biennial convention was its first opportunity to adopt a rule governing its nomination process following the statewide adoption of ranked-choice voting. ECF No. 1 at ¶ 28. The Maine Republican Party acknowledges that it adopted Rule 16 so as to reject ranked-choice voting as applied to its primary candidates. *Id.* at ¶ 31.

The June primary election is 14 days away and the Secretary has taken steps to implement ranked-choice voting. *See* ECF No. 1 at ¶ 21. At the end of March, the Secretary promulgated proposed rules which will govern the ranked-choice voting process. *See id.* at ¶ 22. In early May, the Secretary provided ranked-choice voting

4

training to approximately 275 local election officials to prepare them for the June 12 primary. *See* ECF No. 13 at ¶ 16. He also distributed written memoranda addressing election issues, including ranked-choice voting, to election officials in all 500 of the State's voting jurisdictions. *See id.* Finally, the Secretary has already printed ballots that include ranked-choice voting for the Republican gubernatorial and House District 75 primary races which include instructions to rank candidates in order of preference. *See id.* at ¶ 18. Ballots were made available to uniformed service and overseas voters beginning April 27. *See id.* at ¶ 4.

## II. LEGAL ANALYSIS

The Maine Republican Party seeks a preliminary injunction which, if granted, would enjoin the Secretary from employing ranked-choice voting in the June 12 primary, and would require that all of the Republican party primary winners be determined by plurality vote. "A preliminary injunction is an 'extraordinary and drastic remedy' that 'is never awarded as of right.'" *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)) (internal citations omitted). To obtain a preliminary injunction, the moving party must establish: "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in [its] favor, and (4) service of the public interest." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. v. Monroig–Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). However, "[t]he *sine qua non* of this four-part inquiry is likelihood of success on the

merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (emphasis added). I turn to consider the Maine Republican Party's motion relative to the required four-part inquiry, focusing primarily on the likelihood of success on the merits, "the touchstone of the preliminary injunction inquiry." *Maine Educ. Ass'n Benefits Trust v. Cioppa*, 695 F.3d 145, 152 (1st Cir. 2012).

## A.   Likelihood of Success on the Merits

The Maine Republican Party argues that the RCV Act violates its right of association guaranteed by the First and Fourteenth Amendments because it imposes ranked-choice voting in the Party's primary elections despite the Party's policy, expressed in the newly adopted Rule 16, to select its candidates by plurality voting. This challenge requires the Court to explore the relationship between a political party's constitutional right of free association and a state's constitutionally recognized authority to sponsor and regulate elections.

"The freedom to associate with others for the advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments, and '[t]he right to associate with the political party of one's choice is an integral part of this basic constitutional freedom.'" *Cool Moose Party v. Rhode Island*, 183 F.3d 80, 82 (1st Cir. 1999) (quoting *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973)). What is more, the Supreme Court has repeatedly "affirm[ed] the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party 'select[s] a standard bearer who best represents the party's

ideologies and preferences.'" *Cal. Democratic Party v. Jones*, 530 U.S. 567, 575 (2000) (quoting *Eu v. San Francisco Cty. Democratic Central Comm.*, 489 U.S. 214, 224 (1989)). Choosing nominees is vitally important to political parties because "[t]hat process often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views." *Id.* at 575.

Yet, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). The Constitution explicitly requires such oversight as it relates to federal offices, mandating in Article I, § 4, that "[t]he Times, Places and Manner of holding Elections . . . shall be prescribed in each State by the Legislature thereof," U.S. Const. Art. I, § 4, cl. 1, and the Supreme Court has recognized the states' roles in structuring primaries. *See Jones*, 530 U.S. at 572. The Maine Constitution has a corresponding provision, Article 9, § 12, which establishes the State's role in "prescrib[ing] the manner in which the votes shall be received, counted, and the result of the election declared" for all State and national elections. Accordingly, a political party's control over its primaries is far from unbounded. Instead, when a party avails itself of a state-administered election, it compromises some of its self-governance in exchange for access to the state apparatus:

> A political party has a First Amendment right to . . . choose a candidate-selection process that will in its view produce the nominee who best represents its political platform. These rights are circumscribed,

7

> however, when the State gives the party a role in the election process. . . Then . . . the State acquires a legitimate governmental interest in ensuring the fairness of the party's nominating process, enabling it to prescribe what that process must be.

*N.Y. State Bd. of Elections v. López Torres*, 552 U.S. 196, 202-03 (2008) (internal citations omitted).

Pursuant to their interest in ensuring fair elections, states may regulate "the time, place, and manner of holding primary and general elections, [as well as] the registration and qualifications of voters, and the selection and qualification of candidates." *Storer*, 415 U.S. at 730. The Supreme Court has recognized that whenever a state regulates elections and primaries, it will invariably "affect[]—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

Faced with the inevitable tension between political parties' First Amendment freedoms and the constitutional role states shoulder in regulating and implementing elections, courts analyze electoral regulations using a balancing test:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against the "precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789). "Under the prescribed framework, the level of [judicial] scrutiny to be applied corresponds roughly to the degree to which a challenged regulation encumbers First and Fourteenth Amendment rights." *Werme v. Merrill*, 84 F.3d 479, 483 (1st Cir.

1996). If a regulation is found to impose "severe burdens" on a party's associational rights, the regulation must be "narrowly tailored to serve a compelling state interest" to survive constitutional scrutiny. *Clingman v. Beaver*, 544 U.S. 581, 586 (2005) (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). "However, when regulations impose lesser burdens, 'a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'" *Id.* at 586-87 (quoting *Timmons*, 520 U.S. at 358).

### 1. The Severity of the Burden the RCV Act Imposes on Associational Rights

The Maine Republican Party contends that by mandating ranked-choice voting, the RCV Act changes the method the Party deems most appropriate for selecting the candidates who will best represent the Party's beliefs and messages, which constitutes a severe burden on its right to freedom of association. This challenge to the State's authority to legislatively impose a specific method of primary vote counting—over the objection of a political party—presents a constitutional question of first impression. Neither party has identified, nor is the Court aware of any decision in which the Supreme Court (or any court) has ruled on whether states may impose a method for determining election winners that is at odds with a rule set by a political party. Guidance in answering this question is provided, however, by the two areas in which the Supreme Court has found that election laws violate a political party's associational rights: (1) laws regulating who can vote in a party's primary election; and (2) laws that interfere with a political party's internal governance. I consider each area in turn.

The Supreme Court has found a political party's associational rights were violated where state requirements interfered with a party's ability to determine which primary voters can determine the party's nominees for public office. Thus, in *Jones,* the Supreme Court identified associational freedoms in a party's "right to exclude," i.e., the right to select those who may participate in party activities. 530 U.S. at 575. Accordingly, the Court concluded that California's "blanket primary," in which voters could vote for any candidate regardless of the voter's or candidate's party affiliation, was unconstitutional because it required political parties to permit non-party members to vote in party primaries—thus "forcing political parties to associate with those who do not share their beliefs." *Id.* at 586.

The Supreme Court has similarly determined that regulations which, over a political party's objection, restrict the voters permitted to participate in the selection of the party's candidates may impose a severe burden on associational rights. Thus, in *Tashjian v. Republican Party of Connecticut*, a closed primary statute (i.e., one that prevented political parties from allowing non-party members from voting in primaries) was found unconstitutional for impermissibly interfering with a political party's First Amendment right to define its associational boundaries. 479 U.S. 208 (1986). And in *Democratic Party of United States v. Wisconsin ex rel. La Follette*, an open primary statute which, similar to a blanket primary, allowed non-party members to participate in the selection of the party's nominee was deemed unconstitutional because "the freedom to associate for the 'common advancement of political beliefs' necessarily presupposes the freedom to identify the people who constitute the association." 450 U.S. 107, 122 (1981) (quoting *Kusper*, 414 U.S. at 56).

A political party's associational right to determine who may vote in a primary election is not without limits. Thus, in *Clingman*, the Supreme Court upheld Oklahoma's semi-closed primary system, which provided that only registered members of a political party or registered independents—but not any other voters— could vote in that party's primary. 544 U.S. at 584. The Court recognized that the Oklahoma statute burdened a political party's ability to broaden its electorate, but concluded that such a burden was minor. The Court observed that "[t]o deem ordinary and widespread burdens like these severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Id.* at 593.

The Maine Republican Party urges an expansive reading of the *Jones* decision and the related decisions beyond their recognition of political parties' right to include or exclude. According to the Maine Republican Party, *Jones* should be read to mean that a party's associational rights encompass the specifics of the ballot selection process to be employed. ECF No. 18 at 3. However, the Supreme Court has itself interpreted *Jones* as squarely focused on the right to exclude, explaining in *Washington State Grange v. Washington State Republican Party* that:

> [In *Jones*,] [w]e observed that a party's right to exclude is central to its freedom of association, and is never "more important than in the process of selecting its nominee." California's blanket primary, we concluded, severely burdened the parties' freedom of association because it forced them to allow nonmembers to participate in selecting the parties' nominees.

11

552 U.S. 442, 445-46 (2008). Further, the Maine Republican Party's position that Maine's adoption of a ranked-choice primary ballot should be subject to strict scrutiny would, contrary to the warning in *Clingman*, interfere with the State's ability "to run efficient and equitable elections," and thus "compel federal courts to rewrite [the] state['s] electoral codes." 544 U.S. at 593.

In sum, *Jones* and the related decisions are limited to regulations that severely impair a political party's ability to function as a party composed of voters who share a common platform and beliefs because the regulations unduly restrict or expand the pool of voters given a voice in the party's primary elections. The RCV Act has no similar effect.

Courts also gauge the burden associated with a state's election regulations by assessing the degree to which a regulation affects a political party's governance and operations. On one end of a continuum are regulations that burden a party's wholly internal processes, which are considered severe burdens on associational freedom and rarely survive constitutional scrutiny. On the other end, are burdens that are external to the party, which have a much lower effect on associational freedom and survive constitutional scrutiny. This dichotomy is illustrated in *Utah Republican Party v. Cox*, a case involving a challenge to a Utah statute requiring political parties to allow candidates to qualify for a primary ballot through either a nominating convention or by gathering signatures (or both), where the Tenth Circuit framed the issue presented in these terms: "The distinction between wholly internal aspects of party administration on one hand and participation in state-run, state-financed

elections on the other is at the heart of this case." 885 F.3d 1219, 1229 (10th Cir. 2018).

The Supreme Court's jurisprudence also reflects this dichotomy between a party's internal and external processes. *Id.* at 1230; *see also Eu*, 489 U.S. at 230-31. For example, in *Eu*, the contested laws required political parties to establish official governing bodies at the county level, specified who would be the members of the parties' official governing bodies, and included a requirement that the party chair rotate between residents of northern and southern California. 489 U.S. at 230. The law also imposed term limits for a party's state central committee chair. *Id.* at 216. In *Eu*, therefore, interference with internal party governance was the direct intent and effect of the law which, the Court, concluded, was unconstitutional.

Here, the RCV Act does not interfere with the internal governance or processes of the Maine Republican Party. The Maine Republican Party argues, however, that because, under its rules, its elected statewide officials gain voting membership in, or the right appoint members to, its State Committee, the RCV Act's effect on the selection of the Party's nominees interferes with its internal governance, as was the case in *Eu*.[4] ECF No. 18 at 14 n.3; ECF No. 1 at ¶ 33.

The possibility that certain elected Maine Republican Party officials may become part of the organization's governing body, or have the authority to appoint members to that body, is not a requirement imposed by the RCV Act. Thus, the RCV

---

[4] The Secretary responds that whether the RCV Act will, in the end, actually influence which candidates are nominated in the party's primaries is unproven and wholly speculative. Although the Maine Republican Party's assertion that ranked-choice voting will have a significant effect on primary election results is unproven, it is facially reasonable and I therefore accept it for purposes of evaluating the Party's arguments in support of its Motion for a Preliminary Injunction.

13

Act's future effect on the governance of the Maine Republican Party is incidental to its purpose. The Maine Republican Party is free to change its rules to account for that effect if it is dissatisfied with whatever effect, if any, the RCV Act has on the composition of its State Committee. Because the remedy to this potential consequence of the RCV Act is in the Party's control, any burden the RCV Act places on the Maine Republican Party's internal governance is incidental and insubstantial.

Where, as here, a regulation's effect is primarily external, it is unlikely to impose a severe burden on a party's associational rights. The Supreme Court has long recognized that a state's power to require parties to choose their general nominees by primary or convention: "[it is] too plain for argument . . . that the State may . . . insist that intraparty competition be settled before the general election by primary election or by party convention." *Am. Party of Tex. v. White*, 415 U.S. 767, 781 (1974). Similarly, the RCV Act regulates a facet of the primary election—the ballot—which is external to issues of party governance and processes, and therefore falls within the ambit of the State's regulatory powers. Moreover, nominees selected through the primary process are not just party leaders, they are potential public officials. This necessarily imbues the selection process with a substantial external, public interest. As recognized in *Cox*:

> [W]hen the party's actions turn outwards to the actual nomination and election of an individual who will swear an oath not to protect the Party, but instead the Constitution, and when the individual ultimately elected has the responsibility to represent all the residents in his or her district, the state acquires a manifest interest in that activity, and the party's interest in such activity must share the stage with the state's manifest interest.

*Cox*, 885 F.3d at 1229. Such is the case here.

14

The scope of a state's authority to regulate primary elections is also demonstrated in *López Torres*, where the Supreme Court upheld a New York statute that required political parties to select their nominees for judgeships at a convention of delegates who were elected in a primary vote held shortly before the parties' conventions. 552 U.S. at 203-207. The Court simultaneously recognized that states may require parties "to set their faces against 'party bosses' by requiring party-candidate selection through processes more favorable to insurgents, such as primaries," but also that states are not constitutionally required to do so. *Id.* at 205. In line with that observation, the Court concluded that, although a state-mandated selection process may change an election outcome, that effect does not cross any First Amendment boundaries. *Id.* at 205-06.

Thus, the fact that ranked-choice voting may produce a standard-bearer for a particular office who is different than the candidate who would have won the primary had a simple plurality been required does not alone constitute a severe burden on the Maine Republican Party's First Amendment right of association. The relevant case law demonstrates that the possibility that a state's nondiscriminatory regulation of the time, place, and manner of an election will change an election's outcome does not, without more, offend the First Amendment. *See, e.g., Timmons*, 520 U.S. at 369 ("[W]e have repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activit[ies] at the polls.") (internal quotation marks omitted) (alteration in original). Just as state-mandated primaries do not severely burden the right of association, employing ranked-choice voting as a facet of a primary presents a similarly non-severe regulation.

Because the RCV Act does not regulate who may participate in a primary or intrude on the Maine Republican Party's internal governance or processes, its effect on Maine's primary process does not impose a severe or heavy burden on the Maine Republican Party's associational rights. With this conclusion, I turn to consider the state regulatory interests that apply.

### 2. State Regulatory Interests

"When a state electoral provision places no heavy burden on associational rights, 'a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'" *Clingman*, 544 U.S. at 593 (quoting *Timmons*, 520 U.S. at 358). "Under this forgiving standard, the party challenging the constitutionality of [a legislative enactment] bears the burden of negating any conceivable basis which might support it." *Donahue v. City of Boston*, 371 F.3d 7, 15-16 (1st Cir. 2004) (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (internal quotations omitted)).

The Secretary claims several interests that support the RCV Act, including the State's interests in: (1) conducting statewide elections in an orderly manner, and in preserving the integrity and reliability of the electoral process (ECF No. 13 at ¶ 13); and (2) establishing a uniform set of rules governing the process of casting and counting ballots at the primary election for all parties in order to assure consistency and uniformity of election administration by all officials involved. *Id.* at ¶ 15.[5] In an

---

[5] The Secretary further asserts that because the RCV Act was initiated by a majority referendum, the State has "a strong interest in implementing the will of the people." ECF No. 13 at ¶ 12. This logic, however, would shield every public referendum from constitutional scrutiny.

*amicus curaie* brief, the Committee for Ranked-Choice Voting further asserts that the State has a legitimate regulatory interest in requiring that candidates demonstrate a preliminary showing of substantial support to qualify to appear on the general election ballot. ECF No. 19 at 11.[6]

The Secretary's asserted state interests are rational and survive constitutional scrutiny. The Supreme Court has previously treated the Secretary's first proffered state interest—conducting fair and orderly elections—as legitimate: "States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials." *Timmons*, 520 U.S. at 352. The State's second asserted interest—uniformity and consistency—is no less sound. If adopted, the Maine Republican Party's position would compel the Secretary to permit each political party to dictate how its primary ballots will be constructed and counted. Thus, if the Maine Republican Party adhered to plurality voting, the Maine Democratic Party chose ranked-choice voting, and the Maine Green Independent Party selected yet another ballot counting method, the Secretary and

---

 The Secretary also claims a state interest in avoiding voter confusion that could disrupt the election and cause voter frustration that could lower voter turnout in future elections. *Id.* at ¶¶ 17, 19. The confusion (and resulting voter frustration) that the Secretary seeks to avoid is the confusion that may result from the granting of the Party's injunction. *See, e.g.*, *id.* at ¶ 17. This may provide a sound reason for denying a preliminary injunction, but not to justify the RCV Act itself, which is, as this stage of the analysis, the relevant inquiry.

[6] The Maine Republican Party—citing to a website hosted by The Committee for Ranked-Choice Voting—highlights four purported justifications for the RCV Act which the Maine Republican Party contends are illegitimate under the Supreme Court's ruling in *Jones*: (1) requiring majority rule, thereby ensuring that candidates with the broadest support among the electorate win, (2) reducing the incentives for negative campaigning, (3) eliminating vote splitting by allowing voters to vote for their preferred candidates without the concern that their least favored candidates prevail, and (4) allowing voters to have a "voice" in selecting candidates who may not be their first choice. ECF No. 1 at ¶ 45. At this preliminary stage, I need not and, therefore, do not decide whether any one or more of these alleged reasons for the passage of the RCV Act should be treated as a state interest advanced by the RCV Act and, if so, are a proper basis for electoral regulation by the Secretary. The Maine Republican Party has not advanced a reason to treat these alternative interests as somehow negating or nullifying the legitimate interests otherwise demonstrated in the record.

those responsible for administering Maine's 500 voting jurisdictions would be required to simultaneously implement three different ballot-counting procedures. *See* ECF No. 13 at ¶¶ 14, 16. Permitting political parties to dictate how the Secretary conducts ballot tabulation would pave the way for a far more complex primary election process and raises the specter of voter confusion associated with it, all of which the State has a legitimate interest in avoiding.

The RCV Act also advances the state interest in requiring that candidates for public office demonstrate a preliminary showing of substantial support to appear on the general election ballot. "States have an undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot." *Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986) (internal quotation marks omitted); *see also Bullock v. Carter*, 405 U.S. 134, 145 (1972) ("The Court has recognized that a State has a legitimate interest in regulating the number of candidates on the ballot. In so doing, the State understandably and properly seeks to . . . assure that the winner is the choice of a majority, or at least a strong plurality, of those voting . . . .") (internal citations omitted); *Williams v. Rhodes*, 393 U.S. 23, 32 (1968) ("Concededly, the State does have an interest in attempting to see that the election winner be the choice of a majority of its voters.").

I conclude that the Secretary has asserted legitimate interests which outweigh any limited burden the RCV Act imposes upon the Maine Republican Party's associational freedoms. Thus, the Maine Republican Party has not succeeded in demonstrating a likelihood of success on the merits of its claim.

## B. The Remaining Preliminary Injunction Factors

"[T]he four factors [in the preliminary injunction standard] are not entitled to equal weight in the decisional calculus; rather, '[l]ikelihood of success is the main bearing wall of the four-factor framework.'" *Corp. Technologies, Inc. v. Harnett*, 731 F.3d 6, 9-10 (1st Cir. 2013). Here, the last three factors—irreparable harm, balance of the hardships, and the public interest—"follow the analysis concerning the likelihood of success on the merits." *Freeman v. Morris*, No. 11-cv-00452-NT, 2011 WL 6139216, at *4 (D. Me. Dec. 9, 2011). Specifically, the Maine Republican Party argues that it will be irreparably harmed if the injunction is denied because it will lose First Amendment freedoms;[7] that the balance of hardships tip in its favor because losing First Amendment freedoms is a hardship; and that granting an injunction is in the public interest because the public has no interest in the enforcement of a law that violates the First Amendment. As discussed above, the Maine Republican Party has failed to demonstrate for purposes of their Motion that the RCV Act violates the First Amendment. It follows that the ensuing arguments, each of which depend on a favorable finding with respect to likelihood of success on the merits, are not persuasive.

---

[7] "It is well established that the loss of first amendment freedoms constitutes irreparable injury." *Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981) (cited favorably in *Sindicato Puertorriqueño de Trabajadores v. Fortuno*, 699 F.3d 1, 11 (1st Cir. 2012)). But each case is judged on its own facts, and "[t]he fact that [movants are] asserting First Amendment rights does not automatically require a finding of irreparable injury." *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010); *see also Lock v. Karass*, 382 F. Supp. 181, 192 (D. Me. 2005). Here, the only injury claimed by a party is a violation of its First Amendment rights, and I have found that the Maine Republican Party is unlikely to succeed on the merits of that claim. It follows that the First Amendment claim does not automatically entitle the Maine Republican Party to a finding of irreparable harm.

## III. CONCLUSION

For the foregoing reasons, the Maine Republican Party's Motion for Preliminary Injunction (ECF No. 3) is **DENIED**.

**SO ORDERED.**

**Dated this 29th day of May, 2018.**

                                              /s/ JON D. LEVY
                                            **U.S. DISTRICT JUDGE**